UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TONY DECLOUES** | **CIVIL ACTION** |
| **VERSUS** | **NO. 14-1158** |
| **N. BURL CAIN, WARDEN** | **SECTION "R"(1)** |

### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE.**

Petitioner, Tony Decloues, ("Decloues"), is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.[1] On April 9, 2009, he was charged by felony bill of indictment with one count of second degree murder.[2] On April 20, 2010, following a one-day jury trial, he was found guilty as charged.[3] On April 26, 2010, the trial court sentenced Decloues to the mandatory sentence of life imprisonment without the benefit of parole, probation, or suspension of

---

[1] Rec. Doc. No. 1, Petition.

[2] State Rec., Vol. 1 of 3, Bill of Indictment, 4/9/09.

[3] State Rec., Vol. 1 of 3, Trial Minute Entry, 4/20/10; State Rec., Vol. 2 of 3, Trial Transcript, 4/20/10.

sentence.[4] The Louisiana Fourth Circuit Court of Appeal affirmed Decloues' conviction on March 23, 2011.[5] The Louisiana Supreme Court denied his related writ application on February 3, 2012.[6]

Decloues timely filed an application for post-conviction relief in the state district court.[7] The state district court denied that application on May 3, 2013.[8] His related writ applications were then likewise denied, without stated reasons, by the Louisiana Fourth Circuit Court of Appeal on June 12, 2013,[9] and by the Louisiana Supreme Court on February 7, 2014.[10]

On or about May 16, 2014, Decloues filed a petition for federal *habeas corpus* relief.[11] In his federal petition he asserts two grounds for relief: (1) trial court erred in denying his motion to suppress the confession and evidence because his confessions were involuntary due to drug impairment/intoxication and sleep deprivation; and (2) ineffective assistance of counsel.[12]

The State argues that Decloues' petition may be untimely, but concedes that his claims are fully exhausted.[13] The Court finds that the State's untimeliness argument lacks merit. Decloues

---

[4]State Rec., Vol. 1 of 3, Sentencing Minute Entry, 4/26/10; State Rec., Vol. 2 of 3, Sentencing Transcript, 4/26/10.

[5]*State v. Decloues*, 62 So. 3d 778 (La App. 4 Cir. 2011); State Rec., Vol. 2 of 3, 4th Cir. Opinion, 2010-KA-1247, 3/23/11.

[6]*State ex rel.Decloues v. State*, 79 So.3d 1022 (La. 2012); State Rec., Vol. 2 of 3, La. S. Ct. Order, 2/3/12.

[7]State Rec., Vol. 3 of 3, Post-Conviction Relief Application, undated.

[8]State Rec., Vol. 1 of 3, State Dist. Ct. Judgment, 5/3/13.

[9]State Rec, Vol. 3 of 3, 4th Cir. Order, 2013-K-0782, 5/3/13.

[10]State Rec., Vol. 3 of 3, La. S. Ct. Order, 2013-KH-1694, 2/7/14.

[11]Rec. Doc. No. 1, Petition.

[12]*Id.*

[13]Rec. Doc. No. 16, State's Response.

asserts that his state post-conviction relief application was filed on October 22, 2012,[14] which the State acknowledges is within the time frame which would render his federal petition timely. The State has offered no evidence to rebut Decloues' assertion, and this Court has no reason to doubt the veracity of the asserted date. Thus, this Court will proceed to address the merits of Decloues' claims.

## I.     *Standards of Review*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both. The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

---

[14]Rec. Doc. No. 17, Traverse to State's Answer.

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the " 'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1) ] have independent meaning." *Bell*, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

*Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." *White v. Woodall*, 134 S.Ct. 1697, 1706 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas

> courts introduced rules not clearly established under the guise of extensions to existing law.

*Id.* (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted). The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694. Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant *habeas* relief. *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

*Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (citations omitted; emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—from

using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. *White v. Woodall*, 134 S.Ct. 1697, 1701 (2014).

## II.   *Facts*

On direct appeal, the Louisiana Fourth Circuit Court of Appeal laid out the facts of this case:

On January 10, 2009, June Jones discovered the body of Louise Decloues in the bedroom of Ms. Decloues' home at 1312 Cambronne Street. The seventy-four year old victim had been stabbed five times. Three of the stab wounds were to her upper chest, one was to her upper abdomen, and the last stab wound went through her wrist. In addition, a plastic bag was tied over her head, causing her to asphyxiate. Upon observing the victim lying on the floor with a bag over her head, Ms. Jones ran from the house and called 911. Detective Randi Gant arrived at the scene, finding the defendant (who resided with his mother at 1312 Cambronne Street) in the backyard. He appeared agitated and tried to leave; he told the detective that he did not know what had happened to his mother and that he had been at the house of a friend, Pershing Matthews, since 2:00 p.m. on the previous day. The defendant was transported to the homicide office, where he was met by Detective Anthony Pardo who read him his rights. The defendant signed a rights of arrestee form and indicated to the detective that he understood his rights. He initially told Detective Pardo that he was at Mr. Matthews' house. However, after being confronted with the information that Mr. Matthews disputed this assertion, the defendant eventually confessed to stabbing and suffocating his mother. After taping his confession, the defendant showed the detective the dumpster on Dante Street where he had disposed of the murder weapon and the clothing he had worn during the murder. After obtaining a search warrant for the dumpster, the police retrieved a black gym bag, blue lock box, gloves, sweat shirt, sweat pants, a knife, and a small white bag containing newspaper. Everything recovered from the dumpster except the lock box had blood on it that was identified as human blood. No latent prints were found on the recovered knife, and no DNA testing was conducted on any of the evidence. In addition, two pairs of shoes found under the defendant's bed on Cambronne Street also contained human blood. Meanwhile, shortly after the defendant was transported to the homicide office, Detective Ryan Aucoin arrived at Cambronne Street to conduct the on-scene investigation. He observed the body in the bedroom and blood

6

on the bed. It appeared that the closet and dresser drawers had been rummaged through, a torn shoe box and black purse were on the floor, and crumpled newspaper containing blood was on a chair. Detective Aucoin spoke briefly with the defendant at University Hospital later that evening and found the defendant's speech to be somewhat slurred.

* * *

At the defendant's trial, the State presented the testimony of Ms. Jones (who discovered the victim's body), Doctor Paul McGarry (a forensic pathologist at the Coroner's Office of Orleans Parish) and the police officers who investigated the crime, Detectives Gant, Pardo, and Aucoin. The defendant's videotaped confession was played for the jury. Doctor McGarry testified that, had she received timely medical attention, the victim probably would not have died from the stab wounds and that her demise was hastened by the plastic bag tied tightly over her head while she was still alive, causing her to asphyxiate. The doctor surmised that Ms. Decloues died from a combination of asphyxia and the stab wounds. Detective Pardo testified that he did not force, coerce or promise the defendant anything for his confession and, although the defendant stated he had smoked crack cocaine the day before, he did not appear intoxicated during the interview.

The defendant testified in his own defense as follows. At the time of the murder, he was fifty-five and had lived with his mother on Cambronne Street for ten years. They were not close due to his use of crack cocaine since his early twenties. He had five misdemeanor convictions for possession of drug paraphernalia. In January of 2009, he worked sporadically as an auto mechanic and did other odd jobs. On January 7, 2009, he performed some work for a man renovating a house and was paid in cash. With that money, he bought crack cocaine and smoked it. At approximately 9:00 p.m., he returned home to his mother's house. After showering and eating dinner, he went to his bedroom to watch television. As he was watching television, he started to have some pain in his leg. After taking some Tylenol, he fell asleep until he was awoken suddenly by a nightmare at approximately 2:00 a.m. The gist of the nightmare was that he caught his "woman" in bed with another man. He remembered hitting her on the bed before pulling her to the floor. The defendant also remembered not wanting to look at her bloody face. He then went to the utility room and put the clothes that he was wearing into a black bag. Next thing he knew, he was at a dumpster. At that point he awoke from his dream, after which, he could not go back to sleep. He left the house and went to buy crack cocaine, which he smoked. He returned to the house around 6:30 a.m. on January 8, 2009 to get ready to go to work for Mr. Brown, the auto mechanic.

After he got off of work, he bought more crack cocaine. He and his friend Matthew smoked together until they ran out of crack cocaine and money. The defendant then pawned a saw that he took from the shed behind his mother's house. With that

money, he smoked more crack cocaine with Matthew. The defendant testified that he worked for Mr. Brown on January 9 and 10, 2009, and with the money he earned again bought and smoked crack cocaine.

He got off from work on January 10th at approximately 2:00 p.m. When he went to a convenience store to purchase cigarettes later that afternoon, he noticed an ambulance and fire truck further down the road near his mother's house. Because his leg was bothering him, he called Mr. Brown for a ride. Approximately two hours later, Mr. Brown picked the defendant up and dropped him off at this mother's house. The defendant ran into the house and towards his mother's bedroom. He briefly caught a glimpse of her body lying on the floor.

The defendant stated that he had not had slept or eaten since January 7, 2009. He could remember his dream, but he had no recollection of doing anything to his mother or of anything about his statement to the police. He remembered going to the dumpster. He did not remember going to the hospital, but he did remember having his fingernails scraped. The defendant denied ever stealing anything from his mother.[15]

### III.    Petitioner's Claims

#### 1.    Failure to suppress involuntary confession and evidence seized based upon it

In his first claim, Decloues contends that the trial court erred in failing to suppress his confession, as well as the evidence seized based upon his confession, because he was so intoxicated from drug use and lack of sleep that it rendered his statements involuntary. The last reasoned state-court decision on the issue rejected the claim, finding that the evidence supported the trial court's finding of fact that the degree of intoxication was not sufficient to vitiate the voluntariness of the confession.[16]

The admissibility of a confession is a mixed question of law and fact. *Miller v. Fenton*, 474 U.S. 104, 112 (1985). The determination of the voluntariness of a confession requires the court to

---

[15]*State v. Decloues*, 62 So. 3d 778, 778-79 (La. App. 4 Cir. 2011); State Rec., Vol. 2 of 3, 4th Cir. Opinion, 2010-KA-1247, 3/23/11.

[16]*Id.*

8

consider the "totality of the circumstances," including the "characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973). In entertaining a collateral challenge to the voluntariness of a confession, a federal court must defer to state court fact-finding on "subsidiary factual questions" under 28 U.S.C. § 2254(e)(1), however, the court has an "independent obligation" to determine whether a confession was voluntary under federal law. *Miller*, 474 U.S. at 112. In light of the AEDPA, the state courts' voluntariness determination must therefore not be contrary to, nor an unreasonable application of, federal law.

In order for a confession to be involuntary, there must be some form of coercive police activity. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Thus, while one's "mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." *Id.* at 165.

Here, Decloues asserts that he was too intoxicated to render a voluntary statement. The Louisiana Fourth Circuit Court of Appeal, in the last reasoned state-court decision on the issue, found that the trial court's denial of Decloues' motion to suppress was supported by the record. The Fourth Circuit's review of his videotaped confession concluded that he was read his rights as required under *Miranda v. Arizona*, 384 U.S. 436 (1966), and acknowledged each one individually. The court observed that he was fidgety, but was easily calmed, as the Doctor who evaluated him for competency had noted at his competency hearing. These findings of fact are supported by the record and therefore entitled to great deference before this Court.

Entirely absent from the record is a finding of police coercion. Indeed, in his own petition, Decloues does not assert that the police coerced him in any way. He only states that the police should have waited to question him when he was no longer impaired. Decloues has failed to meet

his burden of showing that police coercion was a factor in his confession. The state courts' finding of involuntariness was therefore neither contrary to, nor an unreasonable application of, Supreme Court precedent.

Furthermore, because Decloues' confession is deemed voluntary, the evidence which was seized as a result of the information in his confession cannot be said to be "fruit of the poisonous tree."[17] *See Wong Sun v. U.S.*, 371 U.S. 471 (1963). Therefore, the state courts' rejection of his motion to suppress the physical evidence was also not contrary to, nor an unreasonable application of, federal law. Decloues is not entitled to federal *habeas corpus* relief on this claim.

### 2. Ineffective assistance of counsel

In his second and final claim, Decloues alleges ineffective assistance of trial counsel for two reasons: (1) failure to investigate and call witnesses; and (2) failure to raise issue of intoxication as a defense.

The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel. Specifically, a petitioner seeking relief must demonstrate both that counsel's performance was constitutionally deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 697 (1984). A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1993); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that a petitioner has made an

---

[17] The State argues that Decloues' claim regarding the physical evidence is foreclosed by the decision in *Stone v. Powell*, 428 U.S. 465, 494 (1976), which bars federal *habeas corpus* review of Fourth Amendment claims where the State has provided the defendant a full and fair opportunity to litigate that claim. However, the State fails to recognize that the underlying claim for a due process violation (and the alleged tainted evidence deriving therefrom) falls under the Fifth Amendment, not the Fourth Amendment. Thus, the application of *Stone v. Powell* is inapposite.

insufficient showing as to either of the two prongs of inquiry, *i.e.* deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. *Strickland*, 466 U.S. at 697.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *See Strickland*, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690). A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir.1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

To prevail on the prejudice prong of the *Strickland* test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett*, 796 F.2d at 793.

Because the state courts rejected petitioner's ineffective assistance of counsel claims on the merits and because such claims present a mixed question of law and fact, this court must defer to

11

the state-court decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002). Moreover, the United States Supreme Court recently explained that, under the AEDPA, federal *habeas corpus* review of ineffective assistance of counsel claims is in fact doubly deferential:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Ibid.* "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles v. Mirzayance*, 556 U.S. 111, 122, 129 S.Ct. 1411, 1413–14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

*Harrington v. Richter*, 562 U.S. 86, 101 (2011). The Supreme Court then explained:

> Surmounting *Strickland's* high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation

12

> amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. *The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

*Id.* at 105 (citations omitted; emphasis added).

In the first part of Decloues' claim, he alleges that his trial counsel failed to investigate by failing to interview and call defense witnesses who would have testified on his behalf. Decloues contends that numerous people, including Gordon Cagnaletta, William Brown, and other neighbors, would have testified in a manner beneficial to his defense. Specifically, he alleges that Cagnaletta would have testified that he didn't believe Decloues could have committed the murder unless he was under the influence of drugs. Furthermore, Decloues also asserts that Cagnaletta would have testified to the numerous rehabilitation facilities Decloues had attended, and reiterate the severity of Decloues' drug addiction.

Decloues further asserts that his employer, Brown, would have testified to the numerous drug binges that he was prone to during his employment. This would have, again, reiterated the severity of his addiction.

Finally, according to Decloues, the "other neighbors" would have testified that he did "many, many loving things" for his mother over the years. Decloues alleges that this would have bolstered his defense that he only committed the terrible crime under the influence of drugs and/or alcohol.

In the last reasoned state-court decision on the issue, the state district court rejected this claim, finding that the only two points the purported testimony would show were (1) his drug usage; and (2) his relationship with his mother. The state district court therefore concluded:

> An examination of the Trial Transcript shows that the jury was well aware of the drug usage and the relationship between the petitioner and the victim. This was accomplished when the defendant himself testified before the jury.[18]

In other words, the state district court found that the purported testimony of the uncalled witnesses would simply be cumulative of Decloues' own testimony. This decision was not contrary to, nor an unreasonable application of Supreme Court precedent.

In fact, as the United States Fifth Circuit Court of Appeals has explained:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain. See *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). For this reason, we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by "nam[ing] the witness, demonstrat[ing] that the witness was available to testify and would have done so, set[ting] out the content of the witness's proposed testimony, and show[ing] that the testimony would have been favorable to a particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).

*Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010). Here, Decloues has failed to meet his burden on this issue. While he has laid out the proposed testimony, he has done so without corroboration of the witnesses themselves. He has produced no affidavits from the witnesses that support any of his contentions. Furthermore, as the state court noted, the witnesses' proposed testimony would merely be duplicative of his own–and therefore would not have been particularly favorable to his defense. Decloues is not entitled to federal *habeas corpus* relief on this claim.

---

[18]State Rec., Vol. 1 of 3, State Dist. Ct. Judgment, 5/3/13.

In the second part of his ineffective assistance of counsel claim, Decloues asserts that his trial counsel was ineffective for failing to assert an affirmative defense of intoxication at trial. This claim must also fail, as Decloues has failed to meet the high burden under *Strickland* of demonstrating constitutionally deficient performance. It is clear from the record that defense counsel challenged the voluntariness of the confession on grounds of intoxication, as well as the admissibility of the resulting evidence, in motions to suppress. Decloues' competency was evaluated in two separate hearings, both which resulted in a finding of competency. Decloues' own testimony was entirely centered around his intoxication as a defense. To whatever extent Decloues' contends trial counsel "failed to raise the defense of intoxication" in a way that he desired, such a decision relates to trial strategy and was not unreasonable. Decloues is not entitled to federal *habeas corpus* relief on this claim.

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Tony Decloues be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).[1]

---

[1] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.

New Orleans, Louisiana, this __18th__ day of ____August____, 2015.

                                                          _____
                                                          **SALLY SHUSHAN**
                                                          **UNITED STATES MAGISTRATE JUDGE**